UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

DANIEL LEE LOPEZ,                          §
                                           §
          Petitioner,                      §
VS.                                        §      CIVIL ACTION NO. 2:12-CV-160
                                           §
WILLIAM STEPHENS,                          §
                                           §
          Respondent.                      §

---

**MEMORANDUM AND ORDER**

---

In 2010, a jury convicted Daniel Lee Lopez of capital murder for killing a police officer during the lawful discharge of his official duties. A separate punishment hearing resulted in a death sentence. Since then, Lopez has consistently sought an expeditious execution of his death sentence. To that end, Lopez unsuccessfully tried to waive the state direct appeal. The state courts found Lopez competent to waive state habeas review.

On May 17, 2012, Lopez filed a pro se federal petition for a writ of habeas corpus (D.E. 1). This matter comes before the Court on Lopez's subsequent motion to waive federal review (D.E. 14). Federal courts must ensure the competency of a capital inmate seeking to terminate judicial review of his state conviction and death sentence. *See Rees v. Peyton*, 384 U.S. 312, 314 (1966). This Court has appointed counsel to protect Lopez's rights. In addition, the Court has appointed an expert, Dr. Timothy Proctor, who examined Lopez and found him competent in all respects. This Court held a hearing in which both Dr. Proctor and Lopez testified.

Lopez's federal habeas attorneys have now filed a "Motion to Deny Requests That Petitioner Be Allowed To Waive Post-Conviction Litigation; And Renewed Motion to Appoint Defense Expert." D.E. 56.  For the reasons discussed below, the Court finds that Lopez is competent and that he knowingly and voluntarily waives his right to federal review.  Accordingly, the Court will deny counsel's motion and grant Lopez's request to dismiss his habeas action.

## BACKGROUND

### I.  The Crime

A brief review of Lopez's crime frames the matters now before the Court.  Shortly after midnight on March 11, 2009, a police officer observed Lopez run a stop sign at nearly sixty miles an hour on neighborhood streets.  After Lopez pulled his vehicle over near the house that he shared with his brother, a confrontation ensued.  As Lopez repeatedly threw punches, the officer tried to use pepper spray.  A factual dispute arose at trial over whether the pepper spray impaired Lopez's ability to see.  The officer fell after taser and radio wires became wrapped around his legs.  Lopez got back in his car and sped away.

Lopez fled because he thought that he had a warrant outstanding for his arrest and because he had drugs in the car.  A police chase began that ultimately involved several officers.  At one point, Lopez circled back to the neighborhood where the pursuit had started.  When he passed by, Lopez's brother saw that Lopez "was crying, he was crying. He looked scared, like he didn't know what to do."  Trial Tr. Vol. 19, p.142.

2

Several other officers joined the pursuit as Lopez continued his flight.  Lopez repeatedly attempted to run into police cruisers.  As Lopez eventually drove away from the neighborhood streets, a police officer laid down stop sticks to flatten Lopez's tires. Lopez, however, avoided them and entered the highway.

Lopez drove down the center of the road while three patrol cars followed.  Officer Stuart Alexander set out stop sticks in Lopez's path.  Officer Alexander stood on the right side near a freeway exit, holding the attached cord.  Lopez approached the stop sticks and then suddenly swerved toward Officer Alexander.  One of the pursuing officers testified at trial that Officer Alexander tried to move out of the vehicle's path but, like "a bullet and a target," Lopez drove straight into him.  Trial Tr. Vol. 17, p. 275.  The impact killed Officer Alexander.

Lopez's vehicle veered off the highway, but then reentered.  The pursuit continued as Lopez's tires shredded.  When police cars boxed him in, Lopez used his vehicle as a "battering ram" to free himself.  Trial Tr. Vol. 17, pp. 279-80.  When an officer exited his crusier after Lopez had finally stopped, Lopez made eye contact, threw his car into reverse, and backed directly at him.  The police finally shot into Lopez's car, injuring him and ending his flight.

The State of Texas charged Lopez with capital murder, along with several other offenses related to the police chase.  Since his arrest, Lopez has single-mindedly pursued a course towards ensuring that the State of Texas will execute him.

## II.     Pre-Trial Psychological Examination

At the defense's request, the trial court appointed Dr. Troy Martinez to evaluate Lopez.  Clerk's Record, p. 19.  Dr. Martinez met with Lopez four times, interviewed Lopez's parents, reviewed his background, performed psychological testing, and examined relevant records.  In his Presentence Psychological Evaluation, Dr. Martinez identified several potential areas of concern, including Lopez's history of behavioral problems, learning difficulties, suicidal acts, explosive anger, and early onset substance abuse.  Dr. Martinez described how Lopez had "(early) mixed feelings about the possibility of a death sentence" which "became increasingly firm over time such that he made clear his desire for a death sentence rather than any period of incarceration (which he perceives as unavoidable)."[1]  Dr. Martinez did not uncover any debilitating mental disease or defect, but concluded that the "[d]iagnostic formulation include[d]: Antisocial Personality Disorder with Borderline features, and ADHD by history".  D.E. 56-C.

## III.    Trial Proceedings

Despite his desire not to challenge the State's case against him, the trial court misinformed Lopez that a capital murder defendant could not plead guilty.  Trial Tr. Vol.

---

[1]      When Dr. Martinez asked Lopez to relate his version of the crime, Lopez "asked, smiling, if [he] wanted 'the truth' or what he planned to tell the jury if [Lopez] testifie[d]."  Lopez would tell the jury that "he intentionally struck the officer with his vehicle, for the purpose of insuring the death penalty rather than any available alternative, i.e, a long-term prison sentence."  However, Lopez said that "the truth" was that pepper spray initially started burning his eyes as he fled from officers, but "the car air conditioner 'cooled it off so [he] turned it full blast and it stopped hurting.  But [his] eyes were still watering."  Lopez described the killing: "He . . . saw the spikes late so he 'swerved late to the right' when he saw the officer 'and tried swerving to the left at the same time he runs to avoid me.  We tried to miss each other and I clip him.  I think I could have missed him if he ran the other way or if I swerved the other way, whichever.'"  D.E. 56-C, pp. 11-12.

4

3, pp.8, 13-14.  A week before trial, Lopez refused a plea deal that would have resulted in

a life sentence without the possibility of parole.  Trial Tr. Vol. 16, pp. 79-80.

Lopez's intent in killing Officer Alexander was the primary concern for jurors.  To

secure a capital conviction, the State had to prove beyond a reasonable doubt that Lopez

intentionally or knowingly killed the victim.  TEX. PENAL CODE § 19.02(b)(1).  The State

argued that the jury could infer Lopez's intent from the circumstances surrounding the

murder, including:  Lopez's repeated efforts to avoid arrest, his violence against the

officer who first pulled him over, his attempts to run over other officers, and testimony

from eyewitnesses that he maneuvered his vehicle directly into the victim.  Trial Tr. Vol.

21, pp. 195-205, 210, 215-19.  The State also emphasized that Lopez previously said he

would "do everything in his power to resist" arrest and "would die before" he "went back

to jail."  Trial Tr. Vol. 19, p. 143; Trial Tr. Vol. 17, p. 51.

The defense vigorously argued that Lopez lacked the intent necessary for a capital

murder conviction.[2]  According to the defense, Lopez was traveling at a high rate of speed

as he approached the stop sticks manned by Officer Alexander.  Lopez swerved to avoid

the stop sticks, but because of poor lighting and pepper spray in his eyes, he never saw

the officer.  Under those circumstances, trial counsel urged the jury to find Lopez guilty

of only a lesser offense.  The jury found Lopez guilty of capital murder.

---

[2]     Mark H. Woerner, Luis P. Garcia, and Patricia A. Shackelford represented Lopez at trial.  The Court will refer to Lopez's defense attorneys collectively as "trial counsel."

In a separate punishment hearing, jurors determined Lopez's fate by answering two special issue questions: (1) would Lopez be a future danger to society and (2) did sufficient evidence mitigate against a death sentence?  The State presented evidence of Lopez's prior criminal acts and bad behavior, characterizing his life of one full of violence, lawlessness, and rejected opportunities for reformation.[3]  The defense called witnesses in an effort to humanize Lopez.  The defense emphasized that, although he had been raised in a home filled with instability and turmoil, Lopez was a loving, attentive father.  The defense recounted mental health issues in Lopez's past, including his suicide attempts that began around age ten.  Cross-examination of defense witnesses, however, brought out additional testimony about Lopez's lawlessness and violence.

On March 5, 2010, the jury returned answers to Texas' special issue questions requiring the imposition of a death sentence.  Clerk's Record, pp. 201-02.  That same day, the trial court sentenced Lopez to death.  Trial Tr. Vol. 26, pp. 128-29.  Lopez had repeatedly told the trial court that, if convicted and sentenced to death, he wanted to waive all appeals.  Trial Tr. Vol. 27, p. 12.  Consistent with the law, the trial court informed Lopez that he could not waive his direct appeal.  Trial Tr. Vol. 26, p.130; *see also* Trial Tr. Vol. 27, p. 4.  On March 8, 2010, the trial court appointed Grant Jones to represent Lopez on direct review. Clerk's Record, p. 226.

---

[3]      During the punishment phase, the State also read into evidence a letter in which Lopez wrote: "My lawyer told me if I take the death penalty and waive all my appeals they will kill me in three years, which I need to die because I am not a good person.  When I die in three years, all my kids will get $300 to $400 a month from SSI till they turn 18 years old." Trial Tr. Vol. 24, pp. 8-9.

6

## IV.    Lopez's Efforts to Waive State Review

Under Texas law, state habeas and appellate review proceed concurrently.  *See*
TEX. CODE CRIM. PRO. art. 11.071 § 4(a).   Within days of his sentencing, Lopez
expressed his desire to forgo state habeas review.  On March 10, 2010, the trial court held
a hearing in which Lopez explained that he wished to waive the appointment of state
habeas counsel.  Describing Lopez as "steadfast in his resolution to be executed," one of
Lopez's trial attorneys explained that he "wants the death penalty.  He'd like to be
executed maybe next week, if they could get it done, and it is quite certain he's not gonna
change his mind."  Trial Tr. Vol. 27, pp. 8-9.   Trial counsel opined that Lopez was
competent to make decisions about waiving representation.   Trial Tr. Vol. 27, p. 6.
Newly appointed appellate counsel also said that he was "very satisfied that [Lopez] is
competent to make this decision."  Trial Tr. Vol. 27, p. 7.[4]

The trial court engaged Lopez in a colloquy to ascertain whether he understood the
consequences of his decision.  Trial Tr. Vol. 27, pp. 11-13.  The trial court specifically
cautioned Lopez that waiving his rights was "not in [his] best interest."  Trial Tr. Vol. 27,
p. 13.   After discussing his legal rights and the consequence of his decision, the trial
court found Lopez competent to forgo the appointment of state habeas counsel.  Trial Tr.
Vol. 27, p. 13.[5]

---

[4]    Appellate counsel specifically informed Lopez that "by . . . waiving the [state] writ, he might be, also,
waiving future review in the federal courts."  Trial Tr. Vol. 27, p. 9.

[5]    The trial court issued a written order stating:

> After addressing defendant in open Court about his decision not to request
> counsel for writ of habeas corpus and after considering the representations of his
> counsel, the Court finds that defendant is competent to make the decision not to
> request counsel for a writ of habeas corpus in this case, that he understands the
> potential negative consequences of his decision, and that his decision is made

On March 11, 2010, the trial court also found Lopez competent to plead guilty to several pending criminal cases against him.  Trial Tr. Vol. 28, pp.10-11.  Lopez received multiple life sentences for those crimes.

On April 5, 2010, Lopez filed a "Motion for Assertion of Pro Se Right" seeking to represent himself on direct appeal.  Clerk's Record, p. 250.  During a hearing on April 6, 2010, the trial court found that Lopez "lack[ed] the competency to understand[] and evaluate the advantages and disadvantages of self representation at the appeal level." Trial Tr. Vol. 29, pp. 11-12.  The trial court did not base this finding on any mental defect or deficiency, but on Lopez's "age, education and lack of experience in dealing in capital murder cases[.]"  Trial Tr. Vol. 29, p. 11.

Appellate counsel filed a brief in the Texas Court of Criminal Appeals on June 2, 2011.  Two months later, Lopez wrote a letter telling the appellate court that he had accepted his fate, disagreed with the issues raised on appeal, and wanted an expedited affirmance of his conviction and sentence.  State Habeas Record, p. 5.[6]

Lopez never filed a state habeas application.  While his direct appeal was still pending, the Court of Criminal Appeals accepted Lopez's waiver of habeas representation and noted that "his failure to timely file an application constitutes a waiver

---

intelligently and voluntarily.  The Court therefore grants defendant's request to waive appointment of counsel for the filing, if any, of any writs of habeas corpus.

Clerk's Record, p. 241.

[6]      On December 30, 2011, Lopez wrote another letter to the Court of Criminal Appeals asking for accelerated consideration of his appeal.  Lopez's letter threatened: "Would you like me to hurt some more correction officers to help speed up the process?  I'll know it's a yes if I haven't heard from y'all within a month because I'm looking forward to starting my life over again or whatever awaits me, cause I'm useless just waiting here."  *Lopez v. State*, No. AP-76,327, letter dated Dec. 20, 2011.

of all grounds for relief that were available to him[.]" *Ex Parte Daniel Lee Lopez*, No. WR 77,157-01 (Tex. Crim. App. Apr. 18, 2012).  Lopez subsequently wrote a letter to the Texas Court of Criminal Appeals asking to waive federal habeas review.  Alternatively, Lopez asked for a form on which to prepare a federal petition in order "to expedite this process[.]"  (*Ex Parte Daniel Lee Lopez*, No. WR 77,157-01, letter dated May 4, 2012).

## V.    Initiation of Federal Proceedings and Conclusion of State Review

Lopez's mandatory direct appeal was still pending in the Court of Criminal Appeals when he filed a pro se federal petition for a writ of habeas corpus on May 17, 2012.  Lopez's petition raises a single issue: "The administration of the death penalty in Texas violates the Eighth Amendment Prohibition of Cruel and Unusual Punishment." D.E. 1, p.6.  In the federal evidentiary hearing, Lopez explained that he invoked federal jurisdiction because someone told him that only by filing a pro se federal petition, and then withdrawing it, could he avoid the appointment of federal counsel and lengthy federal habeas review.[7]

In a September 20, 2102, telephonic conference, Lopez informed the Court that he did not want the appointment of a federal habeas attorney and would move to dismiss his habeas petition.  The Court stayed this instant case pending conclusion of Lopez's direct appeal.  D.E. 10.

---

[7]       In his motion to waive federal review, Lopez says that he thought filing, then voluntarily dismissing, a federal petition "would be quicker instead of waiting for the 1 [year] statute of limitations to expire."  D.E. 14.

9

On October 31, 2012, the Texas Court of Criminal Appeals decided Lopez's direct appeal. *Lopez v. State*, No. AP-76,327, 2012 WL 5358863 (Tex. Crim. App. Oct. 31, 2012). After Lopez filed a "Motion for Waiver of Federal Appeal(s)" this Court reopened the case. D.E. 11, 14.

## VI.  Lopez's Pro Se Filings and the Competency Standard

Lopez's numerous pro se pleadings in federal and state court have unwaveringly conveyed his hope to end all legal challenges. The Constitution generally "grants to the accused personally the right to make his defense" because "it is he who suffers the consequences if the defense fails." *Faretta v. California*, 422 U.S. 806, 819-20 (1975). A criminal defendant's rights are his alone – he is the "master of his own defense." *Moore v. Johnson*, 194 F.3d 586, 606 (5th Cir. 1999). Accordingly, a capital inmate may waive federal review of his state conviction and death sentence, so long as he is competent. *See Whitmore v. Arkansas*, 495 U.S. 149, 165-66 (1990); *Rees*, 384 U.S. at 314. The well-established standard governing a death row inmate's competency to abandon federal habeas review asks "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314.; *see also Wilcher v. Anderson*, 188 F. App'x 279, 281 (5th Cir. 2006); *Rumbaugh v. Procunier*, 753 F.2d 395, 398 (5th Cir. 1985).

Given the severity of Lopez's sentence, and in an abundance of caution, the Court began proceedings to inquire into Lopez's competency.  *See Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000) ("[A] habeas court must conduct an inquiry into the defendant's mental capacity, either *sua sponte* or in response to a motion by petitioner's counsel, if the evidence raises a bona fide doubt as to his competency.").  Because the Court had not yet determined whether Lopez was competent, the Court appointed counsel.  D.E. 15, 17. Lopez's decision to waive federal review has put him at odds with his attorneys who, notwithstanding, have zealously tried to preserve his rights.  In opposition to their efforts, Lopez has actively filed pleadings to expedite a mental evaluation and the determination of his competency.  D.E. 26, 29, 34.  Lopez has also tried to dismiss his current attorneys. D.E. 42, 59.

While expressing frustration with the speed of the proceedings, Lopez's filings display an understanding of the habeas process and the specific mechanisms to determine his competency.  Lopez's pleadings are coherent, logical, and consistent in his goal to waive federal review.  Nothing in the pro se filings hints of mental illness, much less one that would compromise Lopez's ability to make decisions in this case.

## VII.   Dr. Proctor's Examination

While a district court "retains discretion to determine the best course of action" in assessing an inmate's competency, due process generally requires "a current examination by a qualified medical or mental health expert[.]"  *Mata*, 210 F.3d at 331.  At the suggestion of the parties, the Court appointed Dr. Timothy J. Proctor to assess Lopez's

mental status.    D.E. 33.    In preparation for his evaluation, Dr. Proctor examined approximately 9,500 pages of material relating to Lopez's background, including school records, medical files, and Dr. Martinez's report.  From that review, Dr. Proctor compiled a detailed history of Lopez's mental health.

Dr. Proctor's report described Lopez's troubled youth, prior diagnoses of attention deficient/hyperactivity disorder ("ADHD") and depression, repeated violent acts, and suicidal behavior at an early age.[8]  Dr. Proctor performed an in-person evaluation on August 20, 2013.  Dr. Proctor described Lopez as "alert and fully oriented" with a "mostly bright" affect.  In the examination, Lopez "denied suicidal or homicidal ideation."  He also did not describe any "current problems with depression or anxiety."  His "thought processes were logical and goal-directed."   As a result of his examination, Dr. Proctor found no indication of depression, anxiety, or "significant cognitive dysfunction."

Dr. Proctor listed antisocial personality disorder as his "primary diagnosis," but observed that Lopez's "behavior has improved, at least in the controlled environment of prison."[9]  As Lopez was "focused and engaged throughout the lengthy evaluation" and

---

[8]    Dr. Proctor's report explains that Lopez was referred for a psychoeducational evaluation at age seven. Subsequent testing revealed average/low average intelligence, but still classified Lopez as learning disabled and emotionally disturbed.  By age ten, Lopez had experienced suicidal ideation and began engaging in violent acts soon thereafter.  Lopez started receiving mental health treatment at age twelve, resulting in a diagnosis of behavioral problems such as oppositional defiant disorder and intermittent explosive disorder.  Mental health professionals observed that Lopez had difficulty with ADHD and depression.  Dr. Proctor's report described how Lopez's behavior worsened with age.  He assaulted his mother at age twelve.  He was disruptive, disrespectful, and violent at school.  A re-evaluation again identified him as learning disabled and emotionally disturbed.  After dropping out of school at age seventeen, Lopez had numerous run-ins with law enforcement, culminating in the capital murder charge.

[9]    Dr. Proctor based his diagnosis on Lopez's "pervasive history of disregard for and violation of the rights of others" and his "history of failing to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest as well as impulsivity, aggressiveness, disregard for the safety of self/others, and consistent irresponsibility."

Dr. Proctor lacked "sufficient evidence to confirm that the diagnosis is ongoing," he diagnosed Lopez with ADHA "by history."

After describing Lopez as "being very aware of his current legal situation," Dr. Proctor opined that Lopez could "factually and rationally discuss the options available to him, including in particular, pursuing his appeals process as opposed to abandoning it." Dr. Proctor explained that various factors played into Lopez's repeated attempts to expedite execution of his death sentence.  Lopez does not believe that he has a "good action to fight," but he "believes that his conviction and sentence are justified and should not be disputed."  Lopez's religious tenets led him to believe in an afterlife that would be "better than his current situation."  Also, Lopez "desire[s] to know precisely when he will die so that he can plan for, and take care of, any unfinished business."  Lopez said that he "does not believe" that "he will change his mind" about waiving judicial review because "once he sets his mind to something he tends to go through with it [.]"  Ultimately, Dr. Proctor concluded:

    1.    Mr. Lopez has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation.

    2.    Mr. Lopez is not suffering from a mental disease, disorder, or defect which may substantially affect his capacity, such that it prevents him from understanding his legal position and the options available to him and prevents him from making a rational choice among his options.

    3.    Mr. Lopez is competent to waive federal habeas review

(D.E. 54, RX 4.)

## VIII.  Federal Evidentiary Hearing

On February 24, 2014, this Court held an evidentiary hearing in which both Lopez and Dr. Proctor testified.   Dr. Proctor's testimony reiterated and expanded on the information contained in his report.  Dr. Proctor's examination of Lopez was in keeping with both his professional responsibilities and his obligation to assess Lopez's mental status.  The Court finds that Dr. Proctor was credible in his conclusion that Lopez is competent.

The parties and the Court extensively questioned Lopez.  *See Mata*, 210 F.3d at 333 (emphasizing the importance of "face-to-face dialogue between the court and the petitioner").  In particular, the Court repeatedly asked questions to ascertain whether Lopez understood the purpose of the hearing, comprehended the future consequences of his anticipated waiver, and displayed any indicia of mental illness.   This Court's observations of Lopez closely track those reported by Dr. Proctor.  Lopez was alert and attentive throughout the hearing.  When testifying, he spoke coherently.  Lopez answered questions appropriately and without hesitancy.  His testimony was logical and rational. Lopez clearly understands the nature of the criminal proceedings against him to this point, his current status, the role of the court, and the possible outcomes of federal habeas review.   Lopez exhibited no obvious signs of mental impairment or intellectual deficiency.  Throughout his testimony, as throughout his post-judgment proceedings, Lopez was fixed and determined in his desire for the State to carry out his sentence. Lopez's testimony did not raise any concern about his competency.

With that review of the record, and in the context of this Court's observations at the evidentiary hearing, the Court turns to the question of whether Lopez is competent to waive federal habeas review.

## COMPETENCY

After the evidentiary hearing, Lopez's attorneys filed a "Motion to Deny Requests that Petitioner Be Allowed to Waive Post-Conviction Litigation; and Renewed Motion to Appoint Defense Expert."  D.E. 56.  Arguing that "this Court has no obligation to hasten Lopez's suicide," Lopez's attorneys ask this Court to "deny requests to end post-conviction proceedings, so that counsel may develop evidence supporting actual innocence and substantive claims for relief."  D.E. 56, pp. 2, 4.  Lopez's attorneys base their motion on three primary arguments: (1) the possible merit of undeveloped claims should vitiate Lopez's right to waive further proceedings; (2) Lopez's "inclination to drop appeals may be the irrational product of mental illness"; and (3) Lopez's desire to forgo additional review rests on an incorrect understanding of the law and facts.  D.E. 56, p. 4.

Before turning to Lopez's competency, the Court first notes what is not at issue at this stage of the proceedings.  Lopez's attorneys premise their motion on the belief that "substantial issues of actual innocence" and questions concerning effective assistance of trial counsel should prevent Lopez from waiving federal habeas review.[10]  The Court's

---

[10]     Pointing to his "severely handicapped eyesight" because of pepper spray and bad contact lenses, Lopez's attorneys argue that "the Court should not accept Lopez's waiver of his right to federal proceedings" as Lopez "is actually innocent because he did not and could not see Lt. Alexander to avoid colliding with him."  D.E. 56, p. 6. This Court's role centers on Lopez's competency, not the strength of potential arguments for habeas relief.  The Court notes, however, that the actual-innocence argument only augments a foundation that trial counsel built.  Trial counsel argued that Lopez could not see the victim because of the high rate of speed he traveled, his impaired visibility from pepper spray, and the darkness of the highway.  Trial Tr. Vol. 16, p. 73.  Through cross-examination, trial counsel specifically elicited that, though Lopez was only "peppered . . . on the side of the head," Trial Tr. Vol.

inquiry into Lopez's competency operates independent of any putative ground for relief. *Cf. Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993) ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings."). However disquieting it may seem, evaluating Lopez's competency does not delve into the justness of his incarceration or the viability of potential defenses.[11]   The fact that Lopez's attorneys have identified potential grounds for constitutional claims does not void the traditional competency inquiry. The Court may only decide whether Lopez "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation[.]" *Rees*, 384 U.S. at 314.

The Court, therefore, will apply the *Rees* competency test to the record developed in state and federal court. In doing so, the Court follows the Fifth Circuit's separation of the *Rees* standard into a tripartite test:

(1)     Is the person suffering from a mental disease or defect?

(2)     If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

---

16, p. 110, an indirect hit of pepper spray may nonetheless impair a person's vision. Trial Tr. Vol. 16, pp. 209-212. Trial counsel's cross-examination of Lopez's mother revealed that Lopez said that he "couldn't see" because the officer "had pepper sprayed him." Trial Tr. Vol. 17, pp. 55-57. The prosecution, however, alleged that Lopez's mother manufactured her story, Trial Tr. Vol. 17, pp. 58-59; Trial Tr. Vol. 20, pp. 192-93, and that the arresting officers did not see any evidence that Lopez's sight was impaired by pepper spray. Trial Tr. Vol. 19, pp. 170-71, 181-82; Trial Tr. Vol. 20, pp. 192-93, 242, 247. The arguments Lopez's federal attorneys make to prove actual innocence only amplify themes that came before the jury.

[11]     Lopez himself understands the narrow focus of the competency inquiry. In a pro se pleading, Lopez states: "The hearing was solely based on competency, nothing more, nothing less. Therefore [for] my counsel to bring up my unfactual in[n]ocence should be excluded when making your decision." D.E. 55, p.2.

> (3)    If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

*Rumbaugh*, 753 F.2d at 398.[12]   The Fifth Circuit has described how the answer to each question informs the competency inquiry:

> If the answer to the first question is no, the court need go no further, the person is competent.  If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed.  If the first question is answered yes and the second question is answered no, the third question is determinative; if yes, the person is incompetent, and if no, the person is competent.

*Id.* at 398.  The Court will discuss each prong of the *Rees* test below.

## I.    Mental Disease or Defect

Both Dr. Proctor and Dr. Martinez examined Lopez and found no evidence of mental illness that would impair his competence.  True, Dr. Proctor identified several areas of potential concern: a history of suicidal gestures; the prior diagnoses of depressive, oppositional defiant, and attention-deficit/hyperactivity disorders; childhood learning disabilities; and poor impulse control.  In particular, Dr. Proctor diagnosed Lopez with antisocial personality disorder and ADHD by history.  Even in light of those behavioral problems, the record contains no evidence of a severe mental disease or disorder.[13]  Simply, no mental health expert has diagnosed Lopez with any mental illness

---

[12]    Courts often collapse the competency inquiry into two questions: (1) does the inmate have "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation" or (2) does he "suffer[] from a mental disease, disorder, or defect" which may substantially affect his capacity" such that it prevents him from understanding his legal position and from making a rational choice among his options.  *Wilcher*, 188 F. App'x at 281; *see also Mata*, 210 F.3d at 328.

[13]    Specifically, a diagnosis of antisocial personality disorder alone does not call into question an inmate's competency.  *See Wood v. Stephens*, 540 F. App'x 442, 423 (5th Cir. 2013) (distinguishing between antisocial

that would render him incompetent.  The Court's observations of Lopez likewise did not hint of mental illness or defect.

Lopez's attorneys challenge Dr. Proctor's expert opinion by alleging that he failed to consider Lopez's history of suicide attempts.  Dr. Proctor's report mentioned, but did not elaborate on, Lopez's prior suicidal behavior.  In his evidentiary hearing testimony, however, Dr. Proctor described how Lopez's past suicide attempts fit into an evaluation of his competency. Because those episodes occurred several years ago, and he does not currently display suicidal or depressive behavior, Dr. Proctor did not see Lopez's suicidal history as indicating mental disturbance.

Suicide attempts alone do not create the need to inquire into a defendant's competency.  *See United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 1995).  Instead, suicidal gestures "must be weighed in conjunction with all other evidence presented with respect to a defendant's mental stability and competence."  *Mata*, 210 F.3d at 330. Lopez's attorneys characterize his recent attempts to end judicial review as a continuation of his past suicidal behavior.  Dr. Proctor did not consider Lopez's attempts to waive judicial review as falling into the category of suicidal behavior, though he admitted that other psychologist may disagree.

Important differences exist between an active, physical attempt to end one's life and allowing the State to carry out a death sentence.  *See Smith by and through Missouri Public Defender Com'n v. Armontrout*, 812 F.2d 1050, 1059 (8th Cir. 1987) (rejecting the

---

personality disorder and "a delusional disorder" for the incompetent-to-be-executed inquiry); *United States v. Jackson*, 463 F. App'x 405, 406-08 (5th Cir. 2012) (an antisocial personality is not "a severe mental illness or cognitive defect" that impairs an inmate's "ability to understand the legal proceedings").

argument that waiving federal habeas review constitutes "state-aided suicide").  As the Fifth Circuit has observed, a defendant's choice to accept his punishment does not necessarily indicate incompetence:

> The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summum bonum*, a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.

*Autry v. McKaskle*, 727 F.2d 358, 363 (5th Cir. 1984) (quoting *Lenhard v. Wolff*, 443 U.S. 1306, 1313 (1979) (Rhenquist, J., in chambers)).  As Lopez credibly denied having any current suicidal ideation, and his overt suicide attempts occurred years ago, nothing in the record connects his past suicidal behavior with his repeated attempts to end judicial review.

The evidence shows that Lopez does not suffer from a mental disease or defect that would affect his capacity to appreciate his options and make a rational choice among them.  Without a basis to question Lopez's mental health, this Court need not consider the remaining elements of the competency inquiry.  *See Rumbaugh*, 753 F.2d at 398.  In the interests of justice, however, the Court will briefly discuss the remaining information showing that Lopez is competent to waive federal habeas review.

## II.    Lopez's Legal Position and the Available Options

Even assuming that Lopez suffers from mental illness, he is competent unless that disease or defect prevents him from understanding his legal position and the options available to him.  *Id.* at 398.  The psychological evaluations and this Court's observations

indicate that Lopez understands the legal landscape before him.  Lopez knows that a jury found him guilty of capital murder and understands why it did so.  Lopez understands the purpose of federal habeas review and the manner in which it would proceed.  He comprehends that a successful habeas action could mean a new trial or sentencing hearing.  Lopez realizes that the State will seek an execution date soon after his habeas petition is dismissed.  He knows that a waiver will mean his death.

Lopez proffers a slender reed that would change his mind: if he believed that he had a good legal claim, he would continue to fight his case.  Questioning by Lopez's attorneys tried to convince him that he misapprehends the law and that viable, if not winning, arguments remain underdeveloped.  Lopez disbelieves his attorneys and sees their assurances as false hope that will never come to fruition.

Lopez's attorneys now argue that he misunderstands the statutory requirements for a capital conviction and, relatedly, that he misjudges the possibility of success on habeas review.  As counsel now describes, Lopez testified that "he could not overturn his capital conviction because he killed a man while feloniously fleeing from the police, so his intent to kill did not matter[.]"  D.E. 56, p.at 8.  Lopez's evidentiary hearing testimony, in other words, described his crime as a felony murder.[14]  Because the "distinguishing element between felony murder and capital murder is the intent to kill," Lopez's attorneys argue

---

[14]    Under Texas law, felony murder occurs when a person "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."  TEX. PENAL CODE § 19.02(b)(3).  The requisite mental state for felony murder must not rise to intentional or knowing conduct.  *See Medina v. State*, 7 S.W.3d 633, 639 (Tex. Crim. App. 1999).

that he misunderstands the potential viability of arguments attacking his intent to kill Officer Alexander. *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999).

However incompletely Lopez understands the strength of putative habeas claims, this Court's narrow focus is on his mental state, not his legal acumen. To be competent, federal law does not require that an inmate fully understand all potential habeas claims. *See Henderson v. Campbell*, 353 F.3d 880, 894-95 (11th Cir. 2003) (requiring only that an inmate understand the "'bottom line' of his legal situation, that he had to continue to engage in the collateral review process or be executed, and that he was able to make a rational choice among these options"); *Ford v. Haley*, 195 F.3d 603, 618 (11th Cir. 1999) ("[A] petitioner need not understand each of the legal issues framed in his habeas petition."). Similar to the inquiry into whether a defendant is competent to waive his right to counsel, an inmate seeking to waive federal habeas review "must do so 'competently and intelligently,'" but his "'technical legal knowledge' is 'not relevant[.]'" *Moran*, 509 U.S. at 399-400 (quoting *Faretta*, 422 U.S. at 836).

Competency in this context centers on "the general issue of whether [an inmate] recognized he was on death row and understood that dismissal of his habeas petition would result in his execution." *Ford*, 195 F.3d at 618. The evidence before the Court plainly shows that Lopez "understand[s] the significance and consequences of [his] particular decision." *Moran*, 509 U.S. at 401. To be sure, the legal issues in capital murder proceedings are complex; the consequences are severe and irreversible. Nonetheless, Lopez has an accurate factual understanding of his case and the legal

proceedings to this point, even though he may not fully appreciate the viability of various arguments.  Lopez understands his legal position and the options available to him.

### III.   A Rational Choice Among Options

Finally, the Court finds that Lopez's current mental state does not impair his ability to make rational choices.  This inquiry differs from whether Lopez is making a wise or beneficial choice from the options available to him.  *See Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004) ("A 'rational choice' does not mean a sensible decision[.]").  In his pleadings and live testimony, Lopez has described why he chooses to abandon all legal challenges. *See, e.g.,* D.E. 29.  Nothing in the record suggests that mental illness or some external factor impairs Lopez's capacity to evaluate his options. While not a choice that this Court would advise or agree with, Lopez's decision to end federal review is not irrational.

In sum, this Court's review of each *Rees* factor indicates that Lopez is competent to dismiss his federal habeas petition and waive additional judicial review of his conviction and sentence.

## KNOWING AND VOLUNTARY WAVIER

The Supreme Court has held that a waiver of a petitioner's "right to proceed" is only valid when the choice is "knowing, intelligent, and voluntary." *Whitmore*, 495 U.S. at 165; *see also Gilmore v. Utah*, 429 U.S. 1012, 1013 (1976); *Mata*, 210 F.3d at 329. This is a distinct question from competency, although "the distinction is not always made clear" in case law.  *O'Rourke v. Endell*, 153 F.3d 560, 587 (8th Cir. 1998).  "A waiver of constitutional rights is voluntary if, under the totality of the circumstances, it was the

product of a free and deliberate choice rather than coercion or improper inducement." *Comer v. Schriro*, 480 F.3d 960, 965 (9th Cir. 2007).

The Court's questioning during the evidentiary hearing showed that Lopez is making a voluntary and knowing decision to end his legal proceedings. The record does not show any external influence or mental condition that would cause Lopez to make the choices he has. Lopez's attorneys suggest that "being confined to solitary confinement – as inmates at the Polunsky Unit are – leads persons that are actually innocent of the crime of which they were convicted to attempt to drop their appeals." D.E. 56, p. 13. Lopez credibly assured both Dr. Proctor and the Court that the conditions of his confinement did not influence his decision to waive federal review. Lopez, in fact, began his goal to end judicial review long before he was confined in the Polunsky Unity. This Court's review of the record and the testimony from the evidentiary hearing assure that no external coercion, influence, or inducement are causing Lopez to abandon his legal rights.

Considering all the circumstances, the Court finds that Lopez knowingly and voluntarily waives his right to federal habeas review.

## CONCLUSION

"Though the penalty is great and our responsibility heavy, our duty is clear." *Rosenberg v. United States*, 346 U.S. 273, 296 (1953) (Clark, J.). The law allows a defendant to make his own choices – even extremely poor ones – about the course of litigation, so long as he is competent. Thus, courts preserve "that respect for the individual which is the lifeblood of the law." *Faretta*, 422 U.S. at 834 (quotation omitted). Lopez understands the drastic consequences of dismissal. Lopez knows that

ending judicial review will allow the State of Texas to execute him within an accelerated time frame.  Lopez does not suffer from any mental disease or defect; he simply wishes to die.  His choice is not a comfortable one, nor one that the Court agrees with, but it is his to make.  Lopez "may conduct his own defense ultimately to his own detriment," but still "his choice must be honored[.]" *Faretta*, 422 U.S. at 834.

The Court finds that Lopez is competent to waive federal habeas review, and that he does so knowingly and voluntarily.  Accordingly, the Court **GRANTS** Lopez's motion to dismiss (D.E. 14).  The Court **DENIES** the post-judgment motion filed by Lopez's attorneys (D.E. 56).

The Court finds Lopez competent to terminate representation by habeas counsel, subject to any appeal from this Court's competency determination.  The Court, therefore, **GRANTS** Lopez's motion to dismiss counsel, effective on the conclusion of any appeal.  The Court expresses sincere appreciation for counsel's dedicated and zealous efforts to preserve the rights of their client.

Should Lopez's attorneys seek appellate review of this Court's competency decision, the Court finds these matters "deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also* 28 U.S.C. § 2253(c).  A Certificate of Appealability will issue with regard to the process, the findings, and the ultimate decision about Lopez's competency.

The Court otherwise **DENIES** all remaining motions.

The Court **DISMISSES** this case **WITH PREJUDICE**.

The Clerk will deliver a copy of this Order to the parties.

ORDERED this 1st day of July, 2014.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE